JOHN McRae v. The State.

No. 9429.    Delivered October 7, 1925.

1.—Murder—Evidence—Of Another Offense—Erroneously Admitted.

Where on a trial for murder, the state was permitted to prove, that on the afternoon of the homicide, and prior thereto appellant had a difficulty with a Mexican, and fired several shots at the Mexican with a pistol. The evidence disclosed that this transaction was in no manner related to or connected with the homicide for which appellant was on trial, and did not come within any of the exceptions to the rule excluding evidence of collateral crimes.

2.—Same—Evidence—Insufficient—To Warrant Death Penalty.

The testimony on the main issue is not such that would warrant the infliction of the death penalty. The manner of the injury to deceased is explained in no way, save by the physical facts, and the testimony of the defendant. No evidence of ill will, nor of an attempt to ravish, is present. With

the record in that condition, the receipt of the irrelevant testimony must have impressed the jury that appellant had a malevolent disposition, and a reckless disregard for human life, and its reception, necessitates a reversal of the judgment.

Appeal from the District Court of Brewster county.   Tried below before the Hon. C. R. Sutton, Judge.

Appeal from a conviction of murder; penalty, assessed at death.

The opinion states the case.

*W. Van Sickle,* for appellant.

*Tom Garrard,* State's Attorney, and *Grover C. Morris,* Assistant State's Attorney, for the State.

MORROW, Presiding Judge.—Appellant is condemned to suffer death for the offense of murder.

According to the State's evidence, on the afternoon of January 12, 1925, Bertha Payne, a young woman nineteen years of age, got into an automobile driven by the appellant. She was seen by several of the State's witnesses to get in the car and sit on the back seat while the appellant was driving it, sitting in the front seat. She was also seen while they were riding along the public road. The car passed several houses and witnesses saw the parties in the situation mentioned.

According to the State's testimony, before the deceased had gotten into the car, appellant had invited another young girl to ride with him but she declined to do so. On the same afternoon, about a quarter of a mile from town, State's witnesses, while driving along the public road, saw the body of the young woman lying near the road with her head in a pool of blood. About fifty yards distant from the body, these witnesses saw a Ford sedan automobile standing still and the appellant, a negro man, was standing nearby. These witnesses did not stop but continued on their journey.

The officers received information touching the whereabouts of the body and went to the place designated and there found a finger ring which belonged to the deceased. They also saw a pool of blood near the road. They followed the car tracks some yards and there found the body of the deceased. The officers then went to the tent at which the appellant lived and where his wife was working. They noticed blood upon his hands and on the car. The blood on the car was on the running board and on the back seat. The appellant's clothes were also bloody. The officers testified that for a space of about 20 feet along near the pool of blood the ground was torn about 8 or 10 feet square. They noticed tracks of a man and woman which showed where the heel of a woman had slid about 14 or 16 inches. The place at which the pool of blood was found, as we understand the

record, was upon a hill, in plain view of the town and near a school-house. Near the pool of blood there were flat limestone rocks but not immediately at the pool. The ground showed that something had been drug about twenty feet.

A doctor who examined the wounds testified that the left jaw of the deceased was fractured; that the upper and lower teeth were loose; that the skin was not broken but merely scratched; that there were no lacerations. The skull was crushed above the temporal bone at a point about two inches above and one inch forward from a vertical line drawn even with the left ear. The doctor made no actual measurements. The blows, according to the doctor, was made with some blunt instrument; that it was possible but improbable that the blows could have been made simultaneously. On cross-examination, the doctor gave the opinion that it was possible that the wounds might have been made by a fall from the automobile upon the rocks nearby. The doctor had never seen the ground upon which the homicide took place.

Appellant testified that while riding in his car, he saw the deceased whom he knew; that she asked to be given a ride; that he told her to get in the car and he would take her home; that when he got to her house she told him to drive past. He drove fast along the road which was hard and bumpy. Upon reaching a hill, she touched his shoulder and told him not to drive so fast; that he then turned around to switch off the gas and reduce the speed when he heard her moan. He turned his head and saw her lying on the ground, flat on her back and her head twisted under a little. He stopped his car as soon as possible. He saw another car passing. He tried to carry the body but it was too heavy, so he drug it a little ways and put it in the car and moved it to the place where it was afterwards found. He explained his conduct by the statement that he was scared and did not know what to do. He told the officers that some of the blood upon his clothing was from a piece of meat. This was not true.

While appellant was testifying in his own behalf, he was asked by State's counsel if he had not taken several shots at a Mexican that afternoon. This he denied but admitted that he had had trouble with a Mexican and that his gun was fired accidentally while he was in the tent and while Mr. Tyler had hold of him. Appellant was specific in his statement that he did not take three shots at a Mexican running across the highway. He said that the Mexican said something about a pistol and told him (appellant) to get his; that he got his pistol as a matter of defense. This testimony was received over appropriate objection, in substances, that it was an irrelevant introduction of evidence of another offense and went beyond the rule permitting such evidence. After it was introduced, appellant put Tyler upon the stand and he testified that the appellant did not shoot at the Mexican. On cross-examination, Tyler testified that he

did see a scuffle between the appellant and the Mexican and saw the appellant grab his pistol out of his coat pocket. He saw the Mexican running from the tent. The witness left the tent and thereafter heard a pistol fired three times. These shots were fired while the witness, Tyler and the Mexican were out of the tent and while the appellant was in it. The shooting was not seen by Tyler but the reports of the shots were heard by him. The witness saw a pistol in the hands of the appellant. Appellant also left the tent and while he was gone, the witness heard the shots fired and saw appellant returning with the pistol in his hands.

The State called the witness Kellogg who testified that he was present during the noon meal and a difficulty occurred between appellant and a Mexican in which the latter made some threatening remarks. Appellant grabbed his pistol and his wife tried to take it away from him. Appellant recovered it and fired it six times. Three of the shots were fired while he and the Mexican were scuffling in the house and the other three were fired as two Mexican boys were leaving. The witness said that in the talk at the table, a dispute arose between appellant and the Mexican, and the appellant said: "Get your pistol, I have got mine." The Mexican used the words, "pistola" and "forty-five" several times.

We are unable to comprehend the relevancy of this testimony. The difficulty between the appellant and the Mexican was an entirely separate transaction from that for which he was on trial. So far as we perceive, it had no bearing upon it whatever except that it had the tendency to impress the jury with the fact that the appellant was a vicious man and disregardful of human life. In failing to sustain the appellant's objection to the inquiry when first made, we are impressed with the view that the learned trial judge fell into error. This was emphasized and repeated over the appellant's appropriate objections by the receipt of testimony of the witnesses Tyler and Kellogg and was accentuated by a rehearsal of the details of the collateral transaction between appellant and the Mexican. The receipt of this testimony can be justified, so far as we are able to judge the record, by no rule of evidence of which we are aware. It is not a part of the *res gestae* of the offense for which the appellant was indicted and is not otherwise, so far as we are able to ascertain, within any of the exceptions to the rule which excludes evidence of collateral crimes.

The testimony on the main issues in the case is not of a nature that would ordinarily lead one to except the infliction of the death penalty. Aside from the fact that the deceased was injured, the manner of her injury is explained in no way save by the physical facts and the testimony of the appellant. The physician who examined her concedes that the injury might have taken place in falling from the automobile. She was first observed by others than the appellant in

a position consistent with such an accident. The record is bare of specific evidence of ill-will and conveys no suggestion of an attempt to ravish the girl or any sinister motive for the homicide. With the record in that condition, the receipt of the irrelevant testimony tended to convey to the jury the idea that the appellant had a malevolent disposition and a reckless disregard of life cannot be regarded other than as harmful. Especially is this true in view of the verdict assessing the extreme penalty for the offense.

Considering the whole record, the error in receiving the improper testimony is not one that is shown to be harmless. Because of it, in the opinion of this court, a new trial should have been granted.

The judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*